Filed 5/13/13  In re Ashley C. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ASHLEY C. et al. Persons Coming Under the Juvenile Court Law. | B244262 (Los Angeles County Super. Ct. No. CK92402) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANGELINA C., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stephen Marpet, Juvenile Court Referee.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John Krattli, County Counsel, James M. Owens, Assistant County Counsel, William D. Thetford Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court sustained allegations against Angelina C. (Mother) and Jaime C. (Father) and asserted dependency jurisdiction over their four children. Mother contests two of the four sustained counts against her. She does not challenge the court's jurisdiction or the disposition, but argues that there is insufficient evidence to support some of the findings under Welfare and Institutions Code section 300.[1] We affirm.

## FACTS

Mother and Father lived together when their first child was born and they married in 1997. They have four children: Ashley (born in 1995); Jaime Jr. (1999); and twin boys R. and R. (2002). The children were detained in March 2012, when the Department of Children and Family Services (DCFS) deemed them to be at "high risk" due to ongoing domestic violence and physical and emotional abuse.

In interviews, family members described Father's behavior. Ashley cited Father's verbal abuse of his children (which included put-downs, name calling and profanity) and his physical abuse of Mother. In July 2011, Father pulled Mother's hair and choked her with his hands. In September 2011, Mother moved with the children to an apartment, but Father comes there, tries to enter, and harasses and demeans Mother. Mother and Ashley stated that Father abuses cocaine and Mother indicated that Father is a registered sex offender. Father still comes to Mother's apartment several times per week to take the twins to school. In 2010 and February 2012, Ashley was hospitalized after slashing her wrists, triggered by "fights with her father." She reported being raped in 2010 by a gang member and a recent blood test showed that she is pregnant.

On February 25, 2012, Father arrived unexpectedly at Mother's apartment. When she refused him entry, Father loitered outside. At that point, Ashley came home. Father grabbed Ashley's hair and punched her in the face with a closed fist, causing her pain. Mother heard Ashley screaming and opened the door to let her inside. As Mother tried to shut the door, Father forced his way in, punched Mother in the face, then ran away.

---

[1]    Statutory references in this opinion are to the Welfare and Institutions Code.

Mother immediately called the police. Father's attack on Mother was witnessed by Ashley and Jaime Jr., both of whom expressed fear of Father. Mother agreed to keep the children from having contact with Father.

Father has a lengthy criminal history. In 1994, he was convicted of lewd or lascivious acts with a child under the age of 14. As a result of this felony conviction, he is a registered sex offender. In 2000, Father was convicted of inflicting corporal injury on a spouse. He was found in possession of controlled substances in 2009, and sent to drug court. In October 2011, Father was arrested for forcing a boy under the age of 10 to orally copulate him in a movie theatre. Though Father was not prosecuted, DCFS found the claim to be substantiated and was providing the boy with voluntary services.[2]

DCFS filed a petition on behalf of the children. It alleges that the children have suffered or are at risk of suffering serious physical harm owing to Father's February 2012 attacks on Ashley and Mother, and his history of physical altercations with Mother, which includes a conviction for spousal abuse. The petition also alleges that Mother failed to protect the children from Father, and allowed him to frequent the home and have unlimited access to the children despite knowing that he is registered sex offender.

At the detention hearing on March 6, 2012, the court found a prima facie case for detaining the children from Father and vested custody with DCFS. They remained in the care of Mother, who denied the allegations in the petition. Father did not appear at the hearing. Restraining orders prevented Father from approaching Mother or the children.

In its April 2012 jurisdiction/disposition report, DCFS wrote that Father was arrested on March 13, 2012. Mother was taking the children to school when Father threw a water bottle at her. As Mother called the police on a cell phone, Father assaulted her, tried to take her telephone away, called her vulgar names, "and threatened to do something to her if he got in trouble for this incident." Mother reported the incident to the police and Father was arrested. Father had a warrant pending because he did not

---

[2]     Father has also been arrested for stealing cars and for disorderly conduct while under the influence of drugs.

3

comply with the terms of his probation in drug court. Further, one of the twins informed the DCFS social worker that his 12-year-old brother Jaime had "raped him" by touching his private parts. The social worker saw a scratch on Ashley's wrist: she had cut herself with broken glass because she feared that Father might be killed in jail due to his record as a sex offender, but she denied suicidal intent.

Ashley told a DCFS interviewer that Father has "a really bad temper" and he "would hit me and my mom a lot," though he did not hit her brothers. Ashley recalled that Father tried to choke Mother once. Ashley started running away from home when she was in the sixth grade. She knows that Father is a registered sex offender, but believes that he got in trouble for having a girlfriend under the age of 18 whose family reported him to the police. When Ashley's friends found out about Father's criminal record, she began cutting her arms because "I just couldn't handle it. I was embarrassed and I started to hate my dad."

Jaime did not see Father hit Ashley on February 25, "but I did hear her screaming downstairs and then she ran upstairs and my mom opened the door for her. My dad started screaming and yelling at my mom and then he socked my mom in her eye. My mom's eye got really red. My mom called the police but my dad left running. They would argue a lot but my dad would hit my sister because she would not listen to him. I saw my dad try to choke my mom one time, but I don't remember when." Like Ashley, Jaime believes that Father got in trouble for having a girlfriend under the age of 18. Jaime denied that Father ever sexually abused him. Although Jaime misses Father, "at least it is more peaceful. We don't have to worry about him and my mom fighting or him and Ashley fighting."

One of the twins reported that "My dad only hits Ashley cuz [*sic*] she doesn't listen. My dad hit my mom in the face because she let Ashley in the house. I didn't see him hit Ashley that day. But another day when we were walking to school, my dad threw a monster bottle at my mom. It hit her on the back of her leg. My dad was mad and saying bad things to my mom." He denied ever being touched inappropriately by Father. The other twin was absent when Father struck Mother, although he heard about it. "I was

4

there when my dad threw the water bottle at my mom and she was really mad.  My dad didn't hit us.  Only Ashley because she ran away and she didn't behave, that's why he would hit Ashley."  He denied sexual abuse by anyone.

Mother did not see Father strike Ashley on February 25, "but I know he hit her because her face was really red.  I did hear them screaming and yelling at each other outside that is why I went to the door.  They were always fighting.  Her dad did hit her before but he was very jealous and would not allow her to have any friends over or do anything.  That is why Ashley would run away."  Mother described increasing physical violence by Father, including an incident in which he put his hands on her neck and she could not breathe.  He would say vulgar things, threaten her, and call her a whore, even when the children were present.  "He would always tell me that something bad was going to happen to me if I called the police on him."

Early in their relationship, Mother found out that Father uses cocaine, but has never seen him use drugs at home.  She found a baggie of cocaine in Father's pocket when Ashley was about four years old .  She encouraged Father to get help for his drug addiction, but he never agreed to do so.  Father was physically abused by his own father, who would lock him the basement for hours without food as a form of punishment.  Mother was aware of Father's status as a sex offender, because it prevented him from getting a job.  Mother reported that Ashley has been running away since age 11, and has a history of psychiatric hospitalizations because she cuts herself.  Mother "appears to minimize the issues surrounding the fact that father is a registered sex offender and does not seem to realize the dangers involved with the children especially Ashley's acting out behaviors."  DCFS noted that after his 1994 conviction for lewd and lascivious acts with a child under 14, Father has been arrested twice for molesting youngsters.

Like her children, Mother believed that Father was a sex offender because he had a young girlfriend whose family reported him to the police.  Father never worked because of his criminal record, so Mother worked six or seven days a week to support the family while Father would cook, clean and take care of the children.  "Then he made me stop working because he said I was not caring for my kids and he thought I was out with

5

another man. He went to my job and made a scene and said he was going to call immigration on the place I worked. I had to stop working because of him."

The social worker was unable to interview Father because he was recently sent to state prison. DCFS recommended that Father receive no reunification services because he committed a violent sex felony. The report notes that the children "are exhibiting behaviors associated with children who are sexual abuse victims." For example, Ashley has been sexually promiscuous since age 11 and has attempted suicide, and one of the twins made "rape" allegations against his brother. Given Father's history of sexual acts with children, DCFS had "grave suspicion" that Father abused his own children. Further, Mother minimizes the children's behaviors and is unable to set appropriate limits. Mother allows Ashley to go out late at night and bring home different boyfriends despite Ashley's history of rape and suicide attempts. Mother knew of Father's 2011 arrest for molesting a small child because there was an investigation to determine whether Father's children were at risk; yet even after his arrest, Mother allowed Father to have unlimited access to the children.

The twin who accused Jaime of "rape" was interviewed privately. He stated that Jaime rapes both twins "every day." He defined rape as being forced to do something or being touched on your private parts. In particular, "my brother gets me from behind and puts his dick on my butt" with his clothes on, and "I don't like it." He did not tell Mother about this. He misses Father and is sad that he is in jail. By contrast, the other twin denied that Jaime ever touched him in his private area, although Jaime does fight with his younger brothers. Both twins denied that Father abused or maltreated them. Jaime denied sexually abusing his younger brothers. Mother does not believe the sexual abuse accusation; however, the twin who made the claim approached Mother, repeated the accusation of rape, and pointed at his penis.

The children began receiving counseling services during the dependency proceeding. They were benefitting from services. Though Ashley had not cut herself since entering counseling, Mother found a rolled up dollar containing white powder in Ashley's possession, which she admitted was crystal methamphetamine. Mother suspects

6

that Ashley uses drugs. The children continue to be placed with Mother. Father was convicted of a drug felony on April 30, 2012, and was serving a two-year prison sentence.

The petition was adjudicated on September 18, 2012. No witnesses were called to testify. The main issue was whether Mother was aware of Father's sex abuse history with children yet allowed him unlimited access to the family home. Mother countered that Father was allowed to have children and there was no evidence that he was ever sexually inappropriate with his own children or that his status placed the children at risk.

The court sustained the allegations, as amended. It said, "The court has substantial evidence of father's abhorrent behavior with other children based upon the evidence before me and that is a continuing ongoing risk and mother knew of this risk." When Mother objected to this finding, the court added, "Clearly, the behavior was such that it does put these children at risk." The court declared the children to be dependents of the juvenile court. Moving to disposition, the court left the children in Mother's care under DCFS supervision, and ordered her to attend individual counseling to address case issues. Mother appeals the court's jurisdictional findings.

## DISCUSSION

The disposition order is an appealable judgment. (§ 395; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 196.) "In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

Mother concedes that dependency court jurisdiction is proper. She wants us to reject some of the court's findings while accepting the validity of other sustained counts against her. For example, Mother does not challenge findings that she failed to protect the children from Father's violent physical altercations. Under the sustained counts that

7

Mother does not contest, she is an offending parent. She relies on *In re Drake* (2012) 211 Cal.App.4th 754, to urge us to reach the merits of her appeal. *Drake* is inapposite. In *Drake*, the court reached the merits because "the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent. Such a distinction may have far reaching implications with respect to future dependency proceedings in this case and father's parental rights." (*Id*. at p. 763.) By contrast, Mother is an offending parent even if we do not reach the merits of her appeal.

Multiple jurisdictional findings need not be reviewed piecemeal. The judgment will be affirmed "if the evidence supports the decision *on any one of several grounds*." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875, italics added.) "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor *if any one of the statutory bases* for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451, italics added; *In re Christian P.* (2012) 208 Cal.App.4th 437, 450; *In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.) If there is any basis for asserting jurisdiction, no reversal of the judgment occurs even if other bases are improper. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.)

The purpose of the dependency proceeding is "to protect the child, rather than prosecute the parent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) This is precisely why the courts are not concerned with each count alleged in the dependency petition—unlike a criminal prosecution, there is not a prison sentence meted out for each count. If evidence supports even one count of parental abuse or neglect, the courts must assert jurisdiction over the child. Given the gravity of the sustained allegations in this case, the court had to exert jurisdiction to protect the children.

Mother contends that there is insufficient evidence to sustain findings against her under subdivisions (b) and (d) of section 300.[3] The challenged counts (b-3 and d-1) relate to Father's status as a registered sex offender. Mother argues that "there was no evidence that Mother's allowing Father to have contact with the children when she knew he was a registered sex offender endangered her children."

Cases finding a substantial physical danger involve "an *identified, specific hazard* in the child's environment—typically an adult with a proven record of abusiveness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) A father's status as a sex offender establishes a presumption that his children are at risk of abuse. (§ 355.1, subd. (d).) Sex offender status—even for an offense that occurred many years earlier with an unrelated child—is prima facie evidence that the offender's own children are persons described by subdivisions (b) and (d) of section 300. (*In re E.B.* (2010) 184 Cal.App.4th 568, 577.) When applying section 355.1, evidence of "a parent's abuse of an unrelated child may well tend to prove that the parent suffers from characteristics that also place the parent's child at substantial risk of similar abuse." (*In re Y.G.* (2009) 175 Cal.App.4th 109, 116.) A mother's claim that she did not know and could not reasonably have known that her husband was a sex offender does not affect the children's status as juvenile court dependents. (*In re Maria R.* (2010) 185 Cal.App.4th 48, 60.)

In this instance, Mother knew that Father was registered sex offender. Indeed, she and Father had a child together in 1995, soon after Father's 1994 conviction for lewd and lascivious acts with a child under 14. Mother claims that Father got in trouble for being involved with a girlfriend under the age of 18, even though his conviction arises from

---

[3] A child may be declared a dependent of the court if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure of inability of his or her parent [ ] to adequately supervise or protect the child . . ." (§ 300, subd. (b)); or if he or she "has been sexually abused or there is a substantial risk that the child will be sexually abused [ ] by his or her parent . . . or the parent [ ] has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d).)

molesting a child under 14. Mother knew Father's conviction was serious enough to prevent Father from ever getting a job during their marriage. Mother maintains that Father's 2011 arrest for forcing a 10-year-old boy to perform oral copulation was "deemed unfounded." Actually, the allegations were substantiated by DCFS and the sexually abused child receives services as a result of the molestation.

In interviews with DCFS, Mother acknowledged that Father has "been arrested on several occasions but denies she knew the reason." Mother's ignorance presumably encompasses Father's drug arrests, car theft arrests, spousal violence arrests and everything else detailed in Father's four-page rap sheet. The dependency court specifically found that Mother knew of Father's "abhorrent behavior with other children." The court did not believe Mother's claims of ignorance, and we cannot disturb its credibility assessment. (*In re E.B.*, *supra*, 184 Cal.App.4th at p. 578.) Mother's claimed unawareness rings particularly untrue because Father's 2011 child molestation arrest triggered an investigation to determine whether his children had also been molested. Mother could not have been unaware of what caused the investigation.

The court could reasonably find that Mother minimized Father's child molestation arrests and conviction, and that she created a detrimental and endangering home environment by leaving the children alone all day with a registered sex offender. No evidence was presented at trial that Father has overcome his sexual proclivity for young children. Father's incarceration does not ensure the children's safety, as he will soon be released from prison. A dependency finding may be sustained if there is a latent risk of harm. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003.) It was not necessary to show that the children in this case were, in fact, sexually abused.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.